**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| JOSE GARCIA, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | Cv. No. 2:12-cv-02774-JPM-cgc |
| v. | ) | Cr. No. 2:10-cr-20405-01-JPM |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

**ORDER TO MODIFY THE DOCKET,**
**DENYING MOTION PURSUANT TO 28 U.S.C. § 2255,**
**DENYING CERTIFICATE OF APPEALABILITY,**
**CERTIFYING THAT AN APPEAL WOULD NOT BE TAKEN IN GOOD FAITH**
**AND**
**DENYING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL**

Before the Court is the Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody ("§ 2255 Motion") filed by Movant, Jose Garcia, Bureau of Prisons ("BOP") register number 244-59-076, who is currently incarcerated at the Moshannon Valley Correctional Institution in Philipsburg, Pennsylvania. (§ 2255 Mot., *Garcia v. United States*, No. 2:12-cv-02774-JPM-cgc (W.D. Tenn.), ECF No. 1.)[1] For the reasons stated below, the Court DENIES the § 2255 Motion.

---

[1] The Clerk is directed to modify the docket to reflect Movant's current address, which was obtained from the BOP's Inmate Locator, http://www.bop.gov/inmateloc, and to mail a copy of this order and the judgment to Movant at that address.

# I.    PROCEDURAL HISTORY

## A.    Criminal Case Number 10-20405

On December 15, 2010, a federal grand jury returned a two-count indictment against Jose Garcia, Hector Garcia, Alejandro Miranda and Rodrigo Fernandez.  (Indictment, *United States v. Garcia*, No. 2:10-cr-20405-01-JPM (W.D. Tenn.), ECF No. 1.)  Count 1 charged that, beginning at least from on or about February 2009, and continuing until on or about December 4, 2010, all defendants conspired to possess with the intent to distribute at least five kilograms of a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. § 846.  Count 2 charged that, on or about December 4, 2010, all defendants, aided and abetted by each other, possessed with the intent to distribute at least five kilograms of a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.  The factual basis for these charges is stated in the presentence report ("PSR") as follows:

4.      According to the investigative file, on December 1, 2010, agents with the Drug Enforcement Administration (DEA) in Memphis, TN, met with a Cooperating Source (CS), at which time the CS placed a recorded telephone call to **Jose Garcia**.  During the telephone conversation, **Jose Garcia** agreed to transport four kilograms of cocaine to the CS.  During a later telephone conversation, **Jose Garcia** indicated he would have five kilograms of cocaine available.  The CS and **Jose Garcia** subsequently agreed to meet on December 4, 2010.

5.      On December 4, 2010, at approximately 11:35 a.m., members of the DEA and the Memphis/Shelby County Interstate Criminal Interdiction Task Force met with the CS at the parking lot of Sam's Club, located at 1805 Getwell Road, Memphis, TN, at which time the CS placed a telephone call to **Jose Garcia**.  Prior to his departure, a digital recording device was placed in the pocket of the CS.  Meanwhile, surveillance was established as the CS drove to the Scottish Inn, located at 4000 Lamar Avenue, Memphis, TN.

6.      After the CS parked at the Scottish Inn, **Jose Garcia** entered the front passenger seat of the vehicle.  The CS then backed the vehicle into a parking space next to a Ford Expedition.  Shortly after, three males, later identified as Hector Garcia, Alejandro Miranda, and Rodrigo Fernandez entered the Ford Expedition.

7.	At approximately 12:27 p.m., agents observed the vehicle, driven by the CS, and the Ford Expedition, driven by Rodrigo Fernandez, depart the Scottish Inn and travel to America's Best Value Inn, located at 3875 American Way, Memphis, TN.  Upon arrival, the CS drove his vehicle around the hotel and then exited the parking lot; however, Rodrigo Fernandez parked the Ford Expedition next to a Ford Windstar.

8.	Surveillance revealed that the vehicle driven by the CS parked at the front door of a Circle K, located at 2678 Getwell Road, Memphis, TN. Meanwhile, Hector Garcia, Alejandro Miranda, and Rodrigo Fernandez exited the Ford Expedition.  Hector Garcia and Rodrigo Fernandez subsequently walked to Room 323, where a female gave a set of keys to Rodrigo Fernandez.

9.	At approximately 12:41 p.m., Hector Garcia, Alejandro Miranda, and Rodrigo Fernandez entered the Ford Windstar and traveled east on American Way.  At approximately 12:42 p.m., the vehicle driven by the CS exited the Circle K parking lot and traveled north on Getwell Road.  Immediately afterwards, the driver of the Ford Windstar, Rodrigo Fernandez, turned left on Getwell Road and followed the CS' vehicle onto I-240 East.  At approximately 12:47 p.m., a traffic stop was conducted on the Ford Windstar, and at approximately 12:50 p.m., a traffic stop was conducted on the CS' vehicle.  The CS and **Jose Garcia** were immediately detained based on prior drug-related telephone conversations and surveillance conducted by DEA.

10.	After Rodrigo Fernandez signed a consent to search form, a service canine was utilized and alerted to the odor of narcotics emitting from the vehicle. A subsequent search of the vehicle resulted in the discovery of a silver wrapped package inside the firewall of the vehicle.

11.	A closer inspection of the Ford Windstar revealed an aftermarket compartment built in the passenger side frame rail, which contained eight packages wrapped in silver tape and smeared in axle grease.  The packages were subsequently found to contain approximately 5.7 kilograms (TGW) of cocaine.

12.	Consequently, Hector Garcia, Alejandro Miranda, and Rodrigo Fernandez, along with **Jose Garcia**, were transported to the Criminal Justice Complex, located at 201 Poplar Avenue, Memphis, TN.  After being advised of their rights, **Jose Garcia**, Alejandro Miranda, and Rodrigo Fernandez agreed to provide a statement.

13.	**Jose Garcia** advised that on the evening of December 3, 2010, he left Arlington, TX, in the Ford Expedition, with Hector Garcia, Alejandro Miranda, and Rodrigo Fernandez.  On the morning of December 4, 2010, the group arrived in Memphis, TN, where they intended to meet with an individual known as "Guero" regarding vehicle titles.  **Jose Garcia** stated he met Guero at

the Scottish Inn, and the pair was en route to Guero's residence. When questioned about the Ford Windstar, **Jose Garcia** stated he advised Hector Garcia, Alejandro Miranda, and Rodrigo Fernandez to take the vehicle to Guero's residence. Further, **Jose Garcia** advised he paid two females and one male $500 to transport the Ford Windstar to Memphis, TN. When questioned about the cocaine being found inside the Ford Windstar, **Jose Garcia** elected to end the interview.

14.     Alejandro Miranda advised that he was a friend of Hector Garcia, but did not meet **Jose Garcia** or Rodrigo Fernandez until immediately prior to their trip from Arlington, TX, to Memphis, TN. The interview was subsequently ended due to Alejandro Miranda having a difficult time with the English language.

15.     Rodrigo Fernandez advised that **Jose Garcia** was going to pay him an unknown amount of money to transport **Jose Garcia**, Hector Garcia, and Alejandro Miranda to Memphis, TN. Therefore, on the evening of December 3, 2010, he transported the group from Arlington, TX, to Memphis, TN, in his Ford Expedition. Rodrigo Fernandez stated that during the trip, **Jose Garcia**, Hector Garcia, and Alejandro Miranda discussed cocaine being concealed in the mini-van, but they did not discuss the amount of cocaine. Of note, Rodrigo Fernandez identified **Jose Garcia** as his brother-in-law, but was not familiar with Hector Garcia or Alejandro Miranda.

16.     At approximately 1:00 p.m., agents met with the individuals staying in Room 323 at America's Best Value Inn. They were identified as Patricia Barker, Crystal Gonzales, and Efrain Rivera. After being advised of their rights, all three individuals agreed to provide a statement.

17.     Patricia Barker advised that she was aware **Jose Garcia** was involved in illegal drug activities because he sold her methamphetamine on occasions. She stated that she told **Jose Garcia** she was without a vehicle or any money, and asked for his help. On November 30, 2010, or December 1, 2010, **Jose Garcia** met with Patricia Barker and told her he found a mini-van for her. He then advised Patricia Barker that she could have the vehicle and $500 if she would drive it [to] Memphis, TN. **Jose Garcia** subsequently took Patricia Barker to pick up the vehicle and register it in her name. Afterwards, **Jose Garcia** dropped Patricia Barker off at home and took the vehicle. Patricia Barker stated she did not see or hear from **Jose Garcia** again until December 3, 2010, when he showed up at her house. He asked her if she was ready to travel to Memphis, TN. Patricia Barker said yes, and subsequently invited her roommates, Crystal Gonzales and Efrain Rivera, to accompany her. The evening of December 3, 2010, **Jose Garcia** and another male arrived at her home in a Cadillac Escalade. Patricia Barker, Crystal Gonzales, and Efrain Rivera then entered the Cadillac Escalade and were transported to a Valero gas station in Grand Prairie, TX, where the Ford Windstar was being fueled by a third male. **Jose Garcia** then

advised Patricia Barker and her roommates to enter the mini-van and drive to Memphis, TN. **Jose Garcia** and the two unidentified males subsequently left the area in the Cadillac Escalade. During the trip, Patricia Barker received a phone call from **Jose Garcia** advising her to meet him at a Wal-Mart gas station in Arkansas. Upon arrival at the designated location, **Jose Garcia** was driving a Ford Explorer and advised her to follow him the rest of the way to Memphis, TN. Once in Memphis, TN, **Jose Garcia** traveled to America's Best Value Inn, where he rented a room for Patricia Barker. Approximately four hours later, two unidentified males arrived at the hotel room and asked Patricia Barker for the keys to the Ford Windstar. Patricia Barker immediately gave the keys to the males without asking any questions. According to Patricia Barker, she did not know exactly what was inside the Ford Windstar, but she had some idea that it might be something illegal. Further, Patricia Barker stated that her roommates did not have any knowledge that **Jose Garcia** was involved in illegal drug activities.

18. Crystal Gonzales and Efrain Rivera corroborated the statement provided by Patricia Barker regarding their trip to Memphis, TN. However, neither of them had much knowledge about **Jose Garcia** or his involvement in the drug business.

19. According to results received from the Drug Enforcement Administration laboratory in Miami, FL, the substance seized tested positive for cocaine hydrochloride. It had a **net weight of 4,386 grams**.

20. At the time **Jose Garcia** entered a plea of guilty, the government stated that the CS identified three additional drug transactions dating back to 2009, in which **Jose Garcia** was involved. According to **Jose Garcia**, he was present, but he was not responsible for the previous drug transactions.

(PSR ¶¶ 4-20.)

Pursuant to a written plea agreement, Jose Garcia appeared before this judge on December 8, 2011, to plead guilty to Count 1 of the Indictment. (Plea Agreement, *United States v. Garcia*, No. 2:10-cr-20405-01-JPM (W.D. Tenn.), ECF No. 120; Min. Entry, *id.*, ECF No. 124; Guilty Plea Hr'g Tr., *id.*, ECF No. 152.) In the Plea Agreement, Garcia "agree[d] that he is pleading guilty to [Count 1] because he is guilty of the charge . . . ." (Plea Agreement at 1, *id.*, ECF No. 120.) Among the provisions of the Plea Agreement were the following:

> JOSE GARCIA recognizes that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the

offenses to which the Defendant is pleading guilty. Indeed, when the Defendant pleads guilty to certain crimes, removal is presumptively mandatory or even automatic. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including his attorney or the district court, can predict to a certainty the effect of his conviction on his immigration status. Defendant affirms that he has discussed the immigration consequences of his guilty plea with his defense counsel. Defendant also affirms that he wants to plead guilty regardless of any immigration consequences that this guilty plea will entail, even if the consequence is his automatic removal from the United States.

> . . . .

JOSE GARCIA understands that neither the United States, nor any law enforcement officer, can or has made any promises or representations as to what the sentence imposed by the Court will be.

As a condition of plea, JOSE GARCIA and the United States mutually agree that the Defendant conspired to possess and distribute approximately 4.3 kilograms of a mixture and substance containing a detectable amount of cocaine. Accordingly, the Defendant is subject to the following statutory penalties: not less than 5 and no more than 40 years imprisonment, a $5,000,000 fine, not less than 4 years supervised release and a special assessment of $100; however, if the Defendant has one prior felony drug conviction, the penalties increase to not less than 10 years and no more than life imprisonment, a $8,000,000 fine, not less than 8 years supervised release, and a special assessment of $100.

As a condition of plea, JOSE GARCIA and the United States agree that the Defendant <u>may</u> qualify for a "safety valve" reduction pursuant to U.S.S.G. § 2D1.1(b)(16) [sic].

> . . . .

JOSE GARCIA understands that this writing constitutes the entire Plea Agreement between the Defendant and the United States with respect to the plea of guilty. No additional promises, representations or inducements, other than those referenced in this Plea Agreement, have been made to the Defendant or to the Defendant's attorney with regard to this plea, and none will be made or entered into unless in writing and signed by all parties. By signing this agreement, the Defendant affirms that he is satisfied with his lawyer's counsel and representation, and hereby freely and voluntarily enters into this plea agreement.

(*Id.* at 1-2, 2-3, 5.)

At the change of plea hearing, the Government disclosed that the net weight of the drugs that were seized was 4.3 kilograms rather than the 5 kilograms charged in the indictment. (Guilty Plea Hr'g Tr. 3-5, *United States v. Garcia*, No. 2:10-cr-20405-01-JPM (W.D. Tenn.), ECF No. 152.)[2] Jose Garcia testified that he had gone through sixth grade in school. (*Id.* at 10.) He was able to speak and understand some English. (*Id.* at 10-11.) He testified that "I don't read, I don't write English. I only speak, I understand." (*Id.* at 11.) Garcia was comfortable reading in Spanish. (*Id.* at 11-12.) Garcia's attorney, Barry McWhirter, is fluent in Spanish. (*Id.* at 12.) Garcia stated that McWhirter speaks Spanish "[p]erfectly." (*Id.*) Garcia testified that, prior to the hearing, the indictment and plea agreement were translated into Spanish. (*Id.*) McWhirter clarified that he had the plea agreement translated into Spanish and that he showed the indictment to Garcia and they discussed it in Spanish. (*Id.* at 13.) McWhirter further clarified that he had had an earlier version of the plea agreement, which did not address the drug quantity, translated into Spanish. (*Id.* at 14-15.)

Garcia testified that he had seen the charges in the indictment and had discussed them in Spanish with his attorney. (*Id.* at 13-14.) Garcia affirmed that he was satisfied with McWhirter's advice and representation. (*Id.* at 14.) Garcia reviewed a Spanish draft of the plea agreement and discussed it with his attorney, and he also discussed the final version of the agreement with his attorney. (*Id.* at 14-15.) He also testified as follows:

> Q. Does the plea agreement represent the complete agreement, this new agreement as completed today as modified to take care of one of the issues that came up, does it fully represent the agreement that you have with the United States, that is, is it the complete agreement?
>
> A. Yes.
>
> Q. Do you understand the terms of the plea agreement?

---

[2] A Spanish-language interpreter was used at the guilty plea and sentencing hearings.

Q.     Yes, yes.

Q.     Has anyone made any promise to you or given you any assurance that is not in the plea agreement in order to persuade you to accept the plea agreement?

A.     No, sir.

Q.     Has anyone threatened you in any way to persuade you to accept the plea agreement?

A.     If anybody threatened me, no.

(*Id.* at 15-16.)

The prosecutor then read the plea agreement into the record, and his statement was simultaneously translated into Spanish. (*Id.* at 16-22.) At that point, the following colloquy occurred:

Q.     Is that the agreement as you understand it?

A.     Yes, sir.

Q.     Has anyone made any promise to you or given you any assurance that is not in the plea agreement in order to persuade you to plead guilty?

A.     No.

Q.     Has anyone attempted in any way to force you to plead guilty?

A.     No, sir.

Q.     Has anyone threatened you in any way at all?

A.     No, sir.

Q.     Are you pleading guilty of your own free will?

A.     Yes, sir.

Q.     Are you pleading guilty because you are, in fact, guilty of the offense as described in the plea agreement which, of course, is a lesser offense than the one described in the indictment?

8

A.     Yes.

.  .  .  .

Q.     You're not agreeing that it was more than five kilograms, but you are acknowledging that it was an amount that exceeded half a kilogram and was less than 4.9 kilograms?

A.     Yes, sir.

Q.     Okay.  In fact, the agreement provides for a specific amount of approximately 4.3 kilograms, do you recall that?

A.     Yes, sir.

(*Id.* at 22-23.)

The Court advised Garcia of the rights he was giving up by pleading guilty.  Specifically, the Court stated that "you will effectively preclude yourself from ever being considered for naturalization as a citizen of the United States.  You will be prohibited in all likelihood without some significant change from ever being able to return to the United States because of your felony conviction."  (*Id.* at 23-24.)  The Court also stated as follows:

Q.     Of course, the plea will also affect your immigration status and will virtually certainly result in your deportation; is that clear?

A.     Yes, yes.

(*Id.* at 24.)

Garcia testified that he understood the penalties for the offense to which he was pleading guilty.  (*Id.*)  He testified that he and his attorney had discussed how the advisory guidelines might apply to him.  (*Id.* at 25.)  He understood that the sentence that would ultimately be imposed may be different from any estimate given to him by his attorney, the Government, or anyone else.  (*Id.*)  He understood that he was waiving his right to challenge his sentence on

direct appeal or through a collateral attack if the Government made a § 5K1.1 motion that was granted by the Court. (*Id.* at 26.)

The Court advised Garcia that he had the right to plead not guilty and explained the rights he would have if the case were to go to trial. (*Id.* at 26-27.) In response, Garcia stated that "I don't want to go to trial." (*Id.* at 27.) He testified that he understood that he had those rights and, by pleading guilty, he was forever waiving them. (*Id.*)

The Court explained to Garcia the substance of Count 1 of the Indictment and outlined what the Government would have to prove to obtain a conviction on that count. (*Id.* at 27-30.) Jose Garcia testified that Hector Garcia picked up the cocaine in Arlington, Texas. (*Id.* at 30.) When Hector Garcia gave the drugs to Jose Garcia, they were in a computer case. (*Id.* at 30-31.) Jose Garcia testified that "I was not getting paid to bring it [to Memphis], I was going to get paid for selling it to the guy here," whose name was Jose Andrade. (*Id.* at 31.) According to Jose Garcia, Andrade would have paid him one thousand dollars "for each one." (*Id.*)

The prosecutor summarized the facts that the Government would have proven had the case gone to trial. (*Id.* at 32-34.) Jose Garcia disputed the prosecutor's statement that he had sold cocaine on three other occasions. According to Garcia, "That statement about me bringing three—selling three sets—or cocaine in three separate occasions, I did not. I came with another person, but I wasn't coming for that." (*Id.* at 34.) Garcia also disputed the prosecutor's statement that Jose Garcia was going to pay $500 to each of the persons in the van that transported the drugs to Tennessee. (*Id.* at 34-35.) Apart from these two statements, Garcia admitted that the prosecutor's description of the events at issue pertaining to the trip that resulted in his arrest was essentially correct. (*Id.* at 35.) Jose Garcia reaffirmed that he wanted to plead guilty. (*Id.* at 35.)

At a hearing on March 19, 2012, the Court sentenced Jose Garcia to a term of imprisonment of seventy-eight months, to be followed by a four-year period of supervised release. (Min. Entry, *id.*, ECF No. 137; Sentencing Hr'g Tr. 17-20, *id.*, ECF No. 153.)[3] Prior to the hearing, defense counsel filed a position paper in which he objected to a proposed four-level enhancement under U.S.S.G. § 3B1.1(a) on the grounds that Jose Garcia was not a leader or organizer and the criminal activity did not involve five or more people. (Position of Def. With Respect to Sentencing Factors, *United States v. Garcia*, No. 2:10-cr-20405-01-JPM (W.D. Tenn.), ECF No. 136.) . At the sentencing hearing, the prosecutor stated that

> [t]he defense has agreed to stipulate to the court that Mr. Jose Garcia did ask Hector Garcia to obtain drugs from a source in Texas which led to what happened here. They are agreeing that Mr. Jose Garcia on other occasions had utilized the government's confidential informant here in Memphis to distribute drugs in the Memphis area. That was something we were debating about putting that witness on for the court, but they are agreeing to that as well, that Mr. Garcia was the one to make contact with—well, I will go ahead and say his name because everybody knows, Jose Andrade (spelled phonetically) basically, and Mr. Andrade told the DEA, and the defense is agreeing that he had worked with Mr. Jose Garcia on other occasions, I believe at least three other occasions to arrange for the distribution of drugs. Due to our evidence on Mr. Alejandro Miranda and Rodrigo Fernandez, as well as the fact that Patricia Barker appears to be the mule that brought the mini van up to Memphis in this case, but the other two individuals with her, based on our evidence, didn't really know what was going on. So based on that, Your Honor, I think we have overall maybe three participants, and we can't meet our burden on that [to show five or more participants].

---

[3] The 2011 edition of the *Guidelines Manual* was used to compute Jose Garcia's sentence. (PSR ¶ 24.) Pursuant to § 2D1.1(c)(5) of the United States Sentencing Guidelines ("U.S.S.G."), the base offense level for a drug offense involving at least 3.5 kilograms but less than 5 kilograms of cocaine is 30. Jose Garcia received a two-level enhancement for being an organizer, leader, manager or supervisor in a criminal activity that involved fewer than five participants, U.S.S.G. § 3B1.1(c), and a three-level reduction for acceptance of responsibility, *id.* § 3E1.1, resulting in a total offense level of 29. Given Garcia's criminal history category of I, the guideline sentencing range was 87-108 months. The Court granted the Government's § 5K1.1 motion and reduced Jose Garcia's offense level to 28, with a sentencing range of 78-97 months.

(Sentencing Hr'g Tr. 4-5, *id.*, ECF No. 153.) As a result of that concession, the Court adopted the defense position and assessed only a two-point enhancement for Jose Garcia's role in the conspiracy, as the defense had recommended. (*Id.* at 5.) Judgment was entered on March 20, 2012. (J. in a Criminal Case, *id.*, ECF No. 139.) Jose Garcia did not appeal, having waived the right to do so.

### B. Civil Case Number 12-2774

On September 7, 2012, Jose Garcia filed his *pro se* § 2255 Motion. (§ 2255 Mot., *Garcia v. United States*, No. 2:12-cv-02714-JPM-cgc (W.D. Tenn.), ECF No. 1.) The sole issue presented is "[e]rroneous and ineffective assistance of counsel." (*Id.* at PageID 5.) The Court entered an Order on November 2, 2012, directing the Government to respond. (Order, *id.*, ECF No. 2.)

On November 20, 2012, the Government filed a motion to release trial counsel from his attorney-client privilege. (Mot. for Release Trial Counsel from Attorney Client Privilege, *id.*, ECF No. 4.) On that same day, the Court granted the Government's motion, released Movant's trial counsel, Barry S. McWhirter, from his attorney-client privilege, and ordered him to cooperate with the Government by providing information, documents and an affidavit addressing Garcia's ineffective-assistance claim. (Order, *id.*, ECF No. 5.) An amended order was entered on November 21, 2012. (Am. Order, *id.*, ECF No. 6.)

On January 29, 2013, the Government filed its response to Garcia's § 2255 Motion ("Answer"). (Answer, *id.*, ECF No. 8.)[4] Garcia did not file a reply.

---

[4] On January 10, 2013, the Government notified the Court that it had received McWhirter's affidavit. (Not. of Filing of Suppl. Aff., *id.*, ECF No. 7.) The affidavit has not been submitted to the Court.

On March 24, 2014, Garcia filed a motion seeking a reduction in his sentence because the safety valve reduction had not been approved and because defense counsel did not tell him that a guilty plea would have immigration consequences. (Mot. to Reduce Sentence, *id.*, ECF No. 13.) The Court CONSTRUES the filing as an amendment to the § 2255 Motion.

## II.        THE LEGAL STANDARDS

Pursuant to 28 U.S.C. § 2255(a),

> [a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

"A prisoner seeking relief under 28 U.S.C. § 2255 must allege either (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid." *Short v. United States*, 471 F.3d 686, 691 (6th Cir. 2006) (internal quotation marks omitted).

After a § 2255 motion is filed, it is reviewed by the Court and, "[i]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion . . . ." Rule 4(b), Rules Governing Section 2255 Proceedings for the United States District Courts ("§ 2255 Rules"). "If the motion is not dismissed, the judge must order the United States attorney to file an answer, motion, or other response within a fixed time, or to take other action the judge may order." *Id.* The movant is entitled to reply to the Government's response. Rule 5(d), § 2255 Rules. The Court may also direct the parties to provide additional information relating to the motion. Rule 7, § 2255 Rules.

"In reviewing a § 2255 motion in which a factual dispute arises, the habeas court must hold an evidentiary hearing to determine the truth of the petitioner's claims." *Valentine v. United States*, 488 F.3d 325, 333 (6th Cir. 2007) (internal quotation marks omitted). "[N]o hearing is required if the petitioner's allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Id.* (internal quotation marks omitted). Where the judge considering the § 2255 motion also presided over the criminal case, the judge may rely on his recollection of the prior case. *Blanton v. United States*, 94 F.3d 227, 235 (6th Cir. 1996); *see also Blackledge v. Allison*, 431 U.S. 63, 74 n.4 (1977) ("[A] motion under § 2255 is ordinarily presented to the judge who presided at the original conviction and sentencing of the prisoner. In some cases, the judge's recollection of the events at issue may enable him summarily to dismiss a § 2255 motion . . . ."). The movant has the burden of proving that he is entitled to relief by a preponderance of the evidence. *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006).

## III.        ANALYSIS OF MOVANT'S CLAIM

In his § 2255 Motion, Garcia claims that his trial counsel rendered ineffective assistance, in violation of the Sixth Amendment. (§ 2255 Mot. at PageID 5, *Garcia v. United States*, No. 2:12-cv-02774-JPM-cgc (W.D. Tenn.), ECF No. 1.) The factual basis for this claim is as follows:

> When I signed my plea agreement I was under deceit by my Counsel.
>
> At the first instance he affirmed to me that my sentence would not [be] higher than 30 months, and that I should [] accept the charge because the informant appointed to me as property of the drug.
>
> I show to him one letter where the owner of the drug award [sic] that I have not had anything that see with that property.

I announced to him too, that the owner of the drug was paid to me, and I had the compromise that not mentioned his name.

Also, I let clear that I was under menace when I affirmed over the property of the drug and I show him as prove one handwrite which let well established the true of the facts.

I proposed to my Counsel that we did one confrontation about [] those facts.

But his answer was, what that might enlargement and complicate the case.

Too, I asked to Counsel why I was received four points more, and his answer was that be not [a] problem because when I signed the agreement, he will take me out that points.

Then, better we go the signed and like that we avoid that they put angry against you.

I told him that on the videos show when the other guy gave money for the pay of the hotel and my expenses. That was a probe for to show that I have neither the manager nor the lieder [sic].

The weight out of the drug never was established, and I always asked to him that weight out the drug, because that was important for the guidelines, he never listen to me.

At the end the four points and the belonging and the weight out of the drug never were fixed by the Counsel, and I received 78 months of imprisonment.

The day of the sentence the Counsel told [] me that was a lot [of] time for me, but that he will talk with the Prosecutor, as far as now I did not see to him again.

I gave him the letters that shown, that I was menace[d] and he never expressed to the Court that situation, before of the sentence.

(*Id.*)

A claim that ineffective assistance of counsel has deprived a movant of his Sixth Amendment right to counsel is controlled by the standards stated in *Strickland v. Washington*, 466 U.S. 668 (1984). To demonstrate deficient performance by counsel, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness."

*Id.* at 688. "A court considering a claim of ineffective assistance must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance. The challenger's burden is to show that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (internal quotation marks and citations omitted).

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.[5] "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding. Counsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Richter*, 562 U.S. at 104 (internal quotation marks and citations omitted); *see also id.* at 112 (citations omitted) ("In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. . . . The likelihood of a different result must be substantial, not just conceivable."); *Wong v. Belmontes*, 558 U.S. 15, 27 (2009) (per curiam) ("But *Strickland* does not require the State to 'rule out' [a more favorable outcome] to prevail. Rather, *Strickland* places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different.").

The two-part test stated in *Strickland* applies to challenges to guilty pleas based on the ineffective assistance of counsel. *Hill v. Lockhart*, 474 U.S. 52, 57-58 (1985). "Where, as here,

_____

[5] "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant." *Id.* at 697. If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. *Id.*

a defendant is represented by counsel during the plea process and enters his plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases." *Id.* at 56 (internal quotation marks omitted). "[T]o satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* at 59;[6] *see also Padilla v. Kentucky*, 559 U.S. 356, 372 (2010) ("[T]o obtain relief on this type of claim, a [prisoner] must convince the court that a decision to reject the plea bargain would have been rational under the circumstances."). A prisoner "cannot make that showing merely by telling [the court] now that [he] would have gone to trial then if [he] had gotten different advice. The test is objective, not subjective . . . ." *Pilla v. United States*, 668 F.3d 368, 373 (6th Cir. 2012). The Supreme Court also emphasized that "it is often quite difficult for petitioners who have acknowledged their guilt to satisfy *Strickland*'s prejudice prong." *Padilla*, 559 U.S. at 371 n.12.

In its Answer, the Government notes that Garcia has not alleged that, if only his attorney had done everything he now contends should have been done, there is a reasonable chance he

_____

[6] The Supreme Court emphasized that,

> [i]n many guilty plea cases, the "prejudice" inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the "prejudice" inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial.

*Hill*, 474 U.S. at 59.

would not have entered into the Plea Agreement and would, instead, have gone to trial. (Answer at 13-14, *Garcia v. United States*, No. 2:12-cv-02774-JPM-cgc (W.D. Tenn.), ECF No. 8.) That point is well taken. During the lengthy and detailed plea colloquy, Garcia repeatedly affirmed that he wanted to plead guilty. The Plea Agreement was beneficial to Garcia. If he had proceeded to trial and been convicted, he would have lost the three-point reduction for acceptance of responsibility and would have lost the opportunity for a § 5K1.1 motion. With an adjusted offense level of 32, a total offense level of 32, and a criminal history category of I, the guideline sentencing range would have been 121-151 months. Additionally, the prosecutor may not have recommended that Garcia be sentenced at the bottom of the guideline range. For this reason alone, Garcia is not entitled to relief on his § 2255 Motion.

The substantive objections raised by Garcia, some of which are difficult to decipher, are also meritless. Garcia first asserts that his attorney promised him that he would receive a sentence of no more than thirty months. (§ 2255 Mot. at PageID 5, *id.*, ECF No. 1.) At the guilty plea hearing, the Court advised Garcia that Count 1 of the Indictment carried a penalty range of "no less than five years in prison and no more than 40 years in prison." (Guilty Plea Hr'g Tr. 24, *United States v. Garcia*, No. 2:10-cr-20405-01-JPM (W.D. Tenn.), ECF No. 152; *see also* Plea Agreement at 3 (same), *id.*, ECF No. 120.) Garcia testified that nobody had made any promises to him that are not in the Plea Agreement, *see supra* pp. 7, 8, and that he understood that the sentence he received might differ from any estimate provided by his attorney, *see supra* p. 9. Garcia made no effort to withdraw from the Plea Agreement after he received the PSR and realized that the sentencing range was greater than what he now contends his attorney told him he would receive. Garcia also has not alleged that, if only he had known that he would

receive a sentence greater than thirty months, there is a reasonable probability that he would not have pled guilty and would have insisted on a trial.

Next, Garcia appears to argue that his attorney did not challenge the facts presented by the Government at the sentencing hearing.  (§ 2255 Mot. at PageID 5, *Garcia v. United States*, No. 2:12-cv-02774-JPM-cgc (W.D. Tenn.), ECF No. 1.)  This portion of Garcia's § 2255 Motion is difficult to decipher.[7]  Even if it were assumed that McWhirter's performance was somehow deficient, Garcia cannot show prejudice.  Where, as here, a movant contends that his attorney rendered ineffective assistance at a sentencing hearing, prejudice is established where an attorney's deficient performance increased a prisoner's sentence.  *See Glover v. United States*, 531 U.S. 198, 202-04 (2001).

Jose Garcia has acknowledged that he is guilty of conspiring to distribute 4.3 kilograms of cocaine.  Nothing in Garcia's § 2255 Motion appears to undercut that admission.  At the sentencing hearing, defense counsel argued that Jose Garcia had been threatened by Hector Garcia.  According to defense counsel,

> there are people threatening him and his family now, and also telling him that he is responsible to pay the value of the cocaine that was actually seized because since he's the one that actually organized it here in Memphis and it fell through, the higher-ups are telling him he is responsible and they are waiting for him in Mexico once he's deported, he will be executed . . . .

(Sentencing Hr'g Tr. 8, *United States v. Garcia*, No. 2:10-cr-20405-01-JPM (W.D. Tenn.), ECF No. 153.)  The Government stated that it had not been able to verify whether any threats had been made on Jose Garcia's life.  (*Id.*)  Jose Garcia insisted that threats had been made against his family and that he had provided a letter to his attorney that corroborated his assertion.  (*Id.* at 9.)  A copy of an incident report documenting a threat to Jose Garcia's sister, which Garcia had

---

[7] The Government's response (Answer at 10-11, *id.*, ECF No. 8) is also less than helpful because it relies on an affidavit executed by McWhirter that was not submitted to the Court.

provided to McWhirter, was marked as an exhibit.  (*Id.* at 9-10.)   Therefore, contrary to Movant's assertion, defense counsel **did** bring the purported threats to the attention of the Court.

In imposing the sentence, the Court applied the factors in 18 U.S.C. § 3553(a) and stated:

> There's a need to be concerned about what will happen to you, but what's going to have to happen is you're going to be deported, so that is simply what is going to happen and, hopefully, things will be sufficiently safe in portions of Mexico that you will be safe there.   Mexico is actually doing very well economically right now, but it is a difficult environment, but then people [who] come to the United States might say the United States can be too.

(*Id.* at 17-18.)

In short, Garcia has not shown either deficient performance or prejudice in connection with his attorney's presentation of the threats because he has not stated what his attorney should have done that he did not do.  He does not appear to argue that his attorney should not have recommended that he plead guilty.  The Court took defense counsel's arguments into account in imposing sentence.  The Court lacks the authority to order that Garcia not be deported.

Next, Garcia argues that his attorney was ineffective because he failed to object to the leadership enhancement at the sentencing hearing.  (§ 2255 Mot. at 5, *Garcia v. United States*, No. 2:12-cv-02774-JPM-cgc (W.D. Tenn.), ECF No. 1.)  As previously noted, however, defense counsel did object to the four-point enhancement recommended in the PSR.  The Court adopted the defense position and assessed only a two-point enhancement for Jose Garcia's role in the conspiracy.  *See supra* pp. 11-12.  Therefore, Garcia has not shown deficient performance or prejudice.

Garcia next argues that his attorney rendered ineffective assistance because he failed to establish the net weight of the drugs.  (§ 2255 Mot. at PageID 5, *Garcia v. United States*, No. 2:12-cv-02774-JPM-cgc (W.D. Tenn.), ECF No. 1.)  Garcia is mistaken.  Although the indictment charged Garcia with a conspiracy to distribute at least five kilograms of a mixture and

substance containing a detectable amount of cocaine, the Government conceded prior to the change of plea hearing that the net weight of the drugs was 4.3 kilograms. That concession is reflected in the Plea Agreement, *see supra* p. 6, and it was mentioned by the Court at the guilty plea hearing, *see supra* pp. 8-9. Jose Garcia was sentenced on the basis of the net weight of the drugs that were seized. *See supra* p. 11 n.3. Accordingly, Garcia cannot show deficient performance.

Finally, Garcia argues that his attorney was ineffective for not talking to him after sentencing. (§ 2255 Mot. at PageID 5, *Garcia v. United States*, No. 2:12-cv-02774-JPM-cgc (W.D. Tenn.), ECF No. 1.) Garcia does not state what he expected his attorney to do for him after the sentencing hearing other than to speak to the prosecutor. Garcia does not state that he would have been willing to cooperate at that point, nor does he state that he had potentially useful information that was not stale.[8] At the sentencing hearing, Garcia reaffirmed that he intended to abide by his agreement to waive his right to appeal. (Sentencing Hr'g Tr. 31, *United States v. Garcia*, No. 2:10-cr-20405-01-JPM (W.D. Tenn.), ECF No. 153.) Garcia has not shown either deficient performance or prejudice.

In his amendment, which was filed on March 24, 2014, Garcia seeks a reduction in his sentence because the safety valve reduction had not been approved. (Mot. to Reduce Sentence, *Garcia v. United States*, No. 2:12-cv-02774-JPM-cgc (W.D. Tenn.), ECF No. 13.) The Court does not have discretion to reduce Garcia's sentence unless the Government files a timely motion under Rule 35(b) of the Federal Rules of Criminal Procedure or the requirements of 18 U.S.C. § 3582(c) have been satisfied. This has not occurred in this case.

---

[8] At the sentencing hearing, the prosecutor suggested that Garcia had been unwilling to provide further information because he wanted assurances that he would not be deported. (*See* Sentencing Hr'g Tr. 8-9, *United States v. Garcia*, No. 2:10-cr-20405-01-JPM (W.D. Tenn.) ("As to his cooperation, it was always sort of contingent on him not being deported."), ECF No. 153.)

To the extent Garcia is arguing that his attorney was ineffective in failing to argue for a "safety valve" reduction, his position is meritless. The Plea Agreement provides that, "[a]s a condition of plea, JOSE GARCIA and the United States agree that the Defendant <u>may</u> qualify for a 'safety valve' reduction pursuant to U.S.S.G. § 2D1.1(b)(16)." (Plea Agreement at 3, *United States v. Garcia*, No. 2:10-cr-20405-01-JPM (W.D. Tenn.), ECF No. 120.) In the 2011 edition of the *Guidelines Manual*, U.S.S.G. § 2D1.1(b)(16) provides that, "[i]f the defendant meets the criteria set forth in subdivisions (1)-(5) of subsection (a) of § 5C1.2 (Limitations on Applicability of Statutory Minimum Sentences in Certain Cases), decrease by **2** levels." Section 5C1.2(a) provides as follows:

> Except as provided in subsection (b), in the case of an offense under 21 U.S.C. § 841, § 844, § 846, § 960, or § 963, the court shall impose a sentence in accordance with the applicable guidelines without regard to any statutory minimum sentence, if the court finds that the defendant meets the criteria in 18 U.S.C. § 3553(f)(1)-(5) set forth verbatim below:

> (1)      the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines before application of subsection (b) of §4A1.3 (Departures Based on Inadequacy of Criminal History Category);

> (2)      the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

> (3)      the offense did not result in death or serious bodily injury to any person;

> (4)      the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848; and

> (5)      not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a

determination by the court that the defendant has complied with this requirement.

Because Garcia was found to be an organizer, leader, manager or supervisor under U.S.S.G. § 3B1.1(c), he was not entitled to the two-level safety valve reduction. Garcia's § 2255 Motion also indicates that he did not provide the Government with all the information he knew concerning the offense or offenses. Therefore, defense counsel was not deficient in failing to raise the issue and Garcia suffered no prejudice.

In his amendment, Garcia also asserts that his attorney did not tell him that he would be deported as a result of his guilty plea. (Mot. to Reduce Sentence, *Garcia v. United States*, No. 2:12-cv-02774-JPM-cgc (W.D. Tenn.), ECF No. 11.) The Plea Agreement advised Garcia that there might be immigration consequences to the plea. (Plea Agreement at 1-2, *United States v. Garcia*, No. 2:10-cr-20405-01-JPM (W.D. Tenn.), ECF No. 120.) The Plea Agreement also states that

> Defendant affirms that he has discussed the immigration consequences of his guilty plea with his defense counsel. Defendant also affirms that he wants to plead guilty regardless of any immigration consequences that this guilty plea will entail, even if the consequence is his automatic removal from the United States.

(*Id.* at 2.) At the change of plea hearing, the Court cautioned Garcia that "the plea will also affect your immigration status and will virtually certainly result in your deportation . . . ." (Guilty Plea Hr'g Tr. 24, *United States v. Garcia*, No. 2:10-cr-20405-01-JPM (W.D. Tenn.), ECF No. 152.) Garcia stated that he understood. (*Id.*) Accordingly, Garcia cannot show deficient performance or prejudice.

Because Garcia is not entitled to relief on any of the issues raised in his § 2255 Motion or his amendment, the Court DENIES the § 2255 Motion. Judgment shall be entered for the Government.

**IV.          APPEAL ISSUES**

Twenty-eight U.S.C. § 2253(a) requires the district court to evaluate the appealability of its decision denying a § 2255 motion and to issue a certificate of appealability ("COA") "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *see also* Fed. R. App. P. 22(b).  No § 2255 movant may appeal without this certificate.

A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right, and the COA must indicate the specific issue(s) which satisfy the required showing.  28 U.S.C. §§ 2253(c)(2) & (3).  A "substantial showing" is made when the movant demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotation marks and citation omitted); *see also Henley v. Bell*, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (same).  A COA does not require a showing that the appeal will succeed.  *Miller-El*, 537 U.S. at 337; *Caldwell v. Lewis*, 414 F. App'x 809, 814-15 (6th Cir. 2011) (same).  Courts should not issue a COA as a matter of course.  *Bradley v. Birkett*, 156 F. App'x 771, 773 (6th Cir. 2005).

There can be no question that the issues raised in Movant's § 2255 Motion are meritless for the reasons previously stated.  Because any appeal by Movant on the issues raised in his § 2255 Motion does not deserve attention, the Court DENIES a certificate of appealability.

The Sixth Circuit has held that the Prison Litigation Reform Act of 1995, 28 U.S.C. §§ 1915(a)-(b), does not apply to appeals of orders denying § 2255 motions.  *Kincade v. Sparkman*, 117 F.3d 949, 951 (6th Cir. 1997).  Rather, to appeal *in forma pauperis* in a § 2255

case, and thereby avoid the appellate filing fee required by 28 U.S.C. §§ 1913 and 1917, the prisoner must obtain pauper status pursuant to Federal Rule of Appellate Procedure 24(a). *Kincade*, 117 F.3d at 952. Rule 24(a) provides that a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit. Fed. R. App. P. 24(a)(1). However, Rule 24(a) also provides that if the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal *in forma pauperis*, the prisoner must file his motion to proceed *in forma pauperis* in the appellate court. *See* Fed. R. App. P. 24(a) (4)-(5).

In this case, for the same reasons the Court denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith. It is therefore CERTIFIED, pursuant to Federal Rule of Appellate Procedure 24(a), that any appeal in this matter would not be taken in good faith. Leave to appeal *in forma pauperis* is DENIED.[9]

IT IS SO ORDERED this 17th day of September, 2015.


s/ JON PHIPPS McCALLA
UNITED STATES DISTRICT JUDGE

---

[9] If Movant files a notice of appeal, he must also pay the full $505 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the Sixth Circuit Court of Appeals within 30 days.